**Jeffrey ABRAHAM, Plaintiff,**

v.

**DIAGNOSTIC CENTER HOSPITAL CORPORATION OF TEXAS,**
Defendant.

Civil Action No. H–99–3125.

United States District Court,
S.D. Texas,
Houston Division.

March 14, 2001.

G Scott Fiddler, Bellaire, TX, for plaintiff.

Juliann Hale Panagos, McGlinchey Stafford, Houston, TX, for defendant.

**MEMORANDUM AND ORDER**

ROSENTHAL, District Judge.

Plaintiff, Jeffrey Abraham, sued his former employer, Diagnostic Center Hospital Corporation of Texas ("Diagnostic Center"), for religious discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Diagnostic Center removed Abraham's suit to federal court and moved for summary judgment as to each of Abraham's claims. (Docket Entry Nos. 1, 14). Abraham responded, dropping his claim of retaliation, clarifying that he sued under a theory of disparate treatment, and arguing that he has met his summary judgment burden. (Docket Entry No. 21). Diagnostic Center filed a reply (Docket Entry No. 23), which Abraham moved to strike (Docket Entry No. 24).

Based on the pleadings, the motion and response, the parties' submissions and the applicable law, Diagnostic Center's motion for summary judgment is GRANTED in part and DENIED in part. The reasons are set out below.[1]

---

1. Because this court denies summary judgment as to Abraham's claim of discrimination, even considering Diagnostic Center's reply and the attachments to the reply, Abraham's motion to strike Diagnostic Center's reply is moot.

## I. Background

Jeffrey Abraham worked as a cook for Diagnostic Center from May 1993 until his discharge on May 6, 1998. (Docket Entry No. 21, Abraham Aff.). During his employment, Abraham worked for Michael Kain, the Executive Chef, and for Laura Heald, the Director of Food and Nutrition Services. *Id.* In 1995, Abraham experienced a religious conversion and "began to speak about his religious beliefs and the good things the Lord had done in his life since his conversion." (Docket Entry No. 10). Abraham alleges that in response to his comments, Kain and Heald began to treat him differently; made sarcastic comments about his religious status; and requested that he keep his religious talk to himself.

Diagnostic Center issued written policies to its employees. Attendance Policy 2.0 set out requirements for an employee to notify his supervisor of absences. The Attendance Policy also defines "excused" and "unexcused" absences and the disciplinary and salary consequences of unexcused absences. The Notification of Absences Policy states that managers "shall instruct their employees to notify them as soon as possible regarding their absence from work." (Docket Entry No. 14, Ex. 1(A)). The Attendance Policy continues: "In an emergency, employees must notify their supervisor immediately, by telephone giving the reason for the absence and the date of return to work. If the supervisor cannot be reached, the Department Director/Administrative designee should be called." Employees "should notify the person in charge of the preceding shift as early as possible (at least two (2) hours or four (4) hours if department specified, prior to beginning of shift) to allow time to find a replacement." The Attendance Policy provides that "[a]ny absence from work without an approved reason and without proper notification, shall be considered unexcused." "An employee who is absent for three consecutive work days without an approved reason and without proper notification or four one-day unexcused absences in any 12 month period will be subject to termination."

It is undisputed that Abraham was aware of the Attendance Policy. In 1996, Abraham received a warning for an unexcused absence. (Docket Entry No. 14, Ex. 1(C)).

On March 28, 1998, Abraham was in an automobile accident and sustained neck and shoulder injuries. (Docket Entry No. 21). Approximately one week later, Abraham sought medical attention. On April 13, 1998, Abraham was scheduled to work beginning at 6:30 a.m. Abraham testified that as he was driving to work, he realized that he was in too much pain to work that day. He returned home and called in at 6:35 a.m. to give notice that he would be unable to work that day. At 7:00 a.m., he called back, talked to Kain, his supervisor, and said that he was going to see a doctor. Abraham obtained a doctor's excuse for that day. Heald and Kain considered his absence unexcused on the ground that Abraham had failed to notify Kain of his inability to work that day until after the start of his scheduled shift.

On April 21, 1998, Abraham was scheduled to begin work at 9:30 a.m. (Docket Entry No. 21, Abraham Aff.). At 9:15 a.m., after he had already dressed for work, Abraham realized that his injured neck was so painful that he would be unable to work. *Id.* Abraham asked his wife to call Diagnostic Center and went to the doctor. The doctor told Abraham that he could not return to work until April 25, 1998. The doctor offered to fax a medical work excuse to Diagnostic Center. Abraham called the Diagnostic Center Human Resources Director, Bill Haines, to find

out where the work excuse should be sent. Abraham testified that Haines told him to fax the doctor's work excuse to Heald and provided a fax number. The doctor's office faxed the work excuse to the number Haines provided. Abraham addressed the fax to "Lori Hill," misspelling Heald's name.

Later that day, Abraham called Haines to confirm receipt of the fax. Haines confirmed that his department had the document. However, Diagnostic Center treated this absence as unexcused on the ground that Abraham's wife, not Abraham, called in to report the absence and did so within two hours of the start of the shift.

Heald wrote Abraham up on a disciplinary action for the two unexcused absences, stating that the discipline was "not a result of Jeff's absence from work, but [was] a result of his failure to notify his supervisor at least two hours prior to his scheduled work time." (Docket Entry No. 14, Ex. 1(E)). The disciplinary action form also bears a handwritten notation stating that "Jeff never returned to review this." *Id.* The record also contains an absence sheet showing that Abraham's absences on April 24, 25, and 26 were excused due to sickness. (Docket Entry No. 21, Kain Aff.).

On April 28, 1998, Abraham saw his doctor again. The doctor advised Abraham not to return to work pending further evaluation of his injuries. (Docket Entry No. 21, Abraham Aff.). Abraham's doctor faxed the work release to the same fax number Haines had provided earlier, once again addressed to "Lori Hill." Abraham had been scheduled to work on both April 29, 1998 and April 30, 1998. Despite the doctor's excuse, faxed to and received by Diagnostic Center, Heald treated Abraham's absences on April 28 and April 29 as unexcused. Heald explained this treatment on the facts that Abraham did not have the doctor's note faxed to Abraham's

direct supervisor, Kain, and did not call Kain prior to two hours before his shift began. (Docket Entry No. 14, Ex. 1).

On April 30, 1998, Abraham's wife, Karen Abraham, went to Diagnostic Center to pick up Abraham's paycheck. (Docket Entry No. 21, Abraham Aff.). At that time, Heald's secretary confirmed that Heald had received the April 28, 1998 medical work excuse and told Karen Abraham to have her husband call Kain. When Abraham did so that evening, Kain asked Abraham to let Kain know how Abraham was feeling and when he would be returning to work.

On May 6, 1998, Laura Heald told Abraham that he was fired for excessive unexcused absences. (Docket Entry No. 21, Abraham Aff.). Abraham alleges that this stated reason was a pretext for discrimination against his religious beliefs. Diagnostic Center moves for summary judgment.

## II. The Applicable Legal Standards

### A. Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56. Under FED. R. CIV. P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Norman v. Apache Corp.,* 19 F.3d 1017, 1023 (5th Cir.1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *See Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). When the mov-

ing party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.1995). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548).

"[W]hen a district court denies a motion for summary judgment on the basis that there exist genuine issues of material fact, the district court is actually making two separate conclusions: 'First, the court has concluded that the issues of fact in question are genuine, i.e., the evidence is sufficient to permit a reasonable factfinder to return a verdict for the nonmoving party. Second, the court has concluded that the issues of fact are material, i.e. resolution of the issues might affect the outcome of the suit under governing law.'" *Lemoine v. New Horizons Ranch & Ctr., Inc.*, 174 F.3d 629, 633 (5th Cir.1999) (quoting *Colston v. Barnhart*, 146 F.3d 282, 284 (5th Cir.1998)).

In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little*, 37 F.3d at 1075 (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

### B.   The Title VII Standards

Under Title VII, it is unlawful for any employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (1988).

A Title VII plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Hall v. Gillman Inc.*, 81 F.3d 35, 37 (5th Cir.1996); *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 n. 4 (5th Cir.1993). To establish a *prima facie* case of discrimination, a plaintiff must show that: 1) he is a member of a protected class; 2) he was qualified for the position that he held; 3) he suffered an adverse employment action; and 4) he was replaced by someone outside his protected class or treated less favorably than others outside the protected class. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

The plaintiff bears the burden of establishing a *prima facie* case of discrimination. *See Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If a plaintiff shows a *prima facie* case, the burden shifts to the defendant to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Id.* at 254, 101 S.Ct. 1089. If a defendant can produce such evidence, the plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons." *Id.* at 253, 101 S.Ct. 1089. The Supreme Court has recently clarified that a "plaintiff's *prima facie* case, combined with sufficient direct evidence to find that the employer's asserted justification is

false, may permit the trier of fact to conclude that the employee unlawfully discriminated." *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000). The trier of fact may "infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* 120 S.Ct. at 2108; *see also Vadie v. Mississippi State University,* 218 F.3d 365, 374 n. 23 (5th Cir.2000) (discussing application of *Reeves* ). At all times, the plaintiff retains the ultimate burden of persuasion. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

## III. Analysis

### A. Title VII Discrimination

#### 1. The Prima Facie Case

In its motion for summary judgment, Diagnostic Center stated that it "takes no position at this juncture on whether Abraham has established a *prima facie* disparate treatment claim under Title VII. Instead [Diagnostic Center] contends that Abraham was fired for a legitimate, nondiscriminatory reason and that Abraham cannot show that the given reason is pretext." (Docket Entry No. 14, p. 11). Abraham has submitted evidence as to each element of a *prima facie* case of religious discrimination and has also submitted evidence disputing Diagnostic Center's proffered reason for terminating his employment. (Docket Entry No. 21).

Abraham asserts that he is a member of a protected class under Title VII. (Docket Entry No. 21, Abraham Aff.). Abraham has also provided summary judgment evidence that he was qualified for the position he held. (*Id.* at Ex. E, response to Abraham's Interrogatory No. 15; Kain Dep., pp. 92–93). The parties agree that Abraham was discharged and suffered an adverse employment action.

As to the fourth element, Abraham submitted competent summary judgment evidence that he was replaced by an individual who was not openly religious and that he was treated less favorably than a coworker who was not openly religious. Kain testified that Abraham was replaced by an individual who was not overtly religious. (Docket Entry No. 21, Kain Dep., p. 83).

Abraham also produced evidence of disparate treatment and pretext. Although another nonsupervisory employee who worked in the same department did not call in sick more than two hours before the start of her shift, Diagnostic Center did not classify her absence as unexcused. Kain testified that to be consistent with the way Abraham's absences were treated, the other employee's absence should also have been treated as unexcused. *Id.* at pp. 88–89.

Abraham has submitted competent summary judgment evidence as to each element of a *prima facie* case of religious discrimination.

#### 2. Diagnostic Center's Asserted Nondiscriminatory Reason

Diagnostic Center asserts that it terminated Abraham's employment, under the Attendance Policy, because Abraham had four unexcused absences in a twelve-month period. These absences were unexcused because Abraham had failed to notify his direct supervisor, Kain, by telephone, at least two hours before his shift was to begin. Diagnostic Center asserts that on April 13, Abraham called after his shift had started; on April 21, Abraham's wife called after Abraham's shift had already begun; and the doctor's second work release, which was faxed before the April 29 and April 30 absences, was insufficient because it was not sent to Kain and because Abraham did not also telephone Kain.

### 3. The Evidence of Pretext

Abraham has submitted evidence: (1) that Kain and Heald made remarks disparaging Abraham's religious beliefs, evidencing discriminatory animus; (2) that Kain and Heald treated his absences differently than the absences of employees who did not openly display their religious beliefs; and (3) that Kain and Heald made the decision to terminate his employment, a result that the attendance policy did not require.

The record shows evidence of the following statements to Abraham:

Michael Kain pulled me to the side and told me that I should not "speak about God" in the work place or sing in the workplace because it could be "offensive" to others and that I needed to be quiet about it. (I would sometimes sing hymns softly to myself while I was cooking, usually such that no one else could hear unless they were right close to me).

On [sic] day he had give [sic] me a recipe to prepare. I realized that I did not have all of the ingredients to prepare the food. I told him that I did not have all the ingredients. He responded sarcastically, "Oh, you can't do it, you said you were saved." I said being saved has nothing to do with the lack of supplies.

Another time when I was injured in a car accident he said, "If you are a man of God why don't you just ask God to fix your neck."

There were other times when if I couldn't do something or the food didn't come out right he would say sarcastic things like, "You are supposed to be a man of God, why don't you get God to do it for you or get it for you." He would say things like this a lot.

(Docket Entry No. 14, Ex. 3).

Abraham provided evidence as to statements made to him by Heald:

Laura Heald kept a nasty attitude toward me after I became a Christian. She would often make sarcastic remarks about my soft singing of hymns and praising God. She said, "Oh since you said you've been saved, I don't see any difference."

She would compare my beliefs with my work performance. She would say, "Oh you were supposed to have got better since you got religious" and when I would tell her I had not been given the right supplies. She would say, "Excuse! See you haven't changed."

There were co-workers that were scheduled to open up the cafeteria at 6:00 a.m. but would call in 45 minutes after their shift began. Their absences would be considered excused, but when I would call in or my wife, I would receive and [sic] unexcused absence.

She would always imply that since I was going to church and believed in God that I should not be calling in sick to work. She stated that my doctor excuses were unjustifiable and since of [sic] professed my salvation I should have been to work.

*Id.* In his affidavit, Abraham stated that Heald and Kain each made comments about his religion and repeatedly mentioned his religion in the context of remarking on his job performance. *Id.*

Diagnostic Center responds that, even assuming the truth of the allegations for the purpose of the motion for summary judgment, "it is well settled that 'stray remarks' alone will not overcome overwhelming evidence corroborating [the defendant's] non-discriminatory rationale" for its employment decision. In *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 655–56 (5th Cir.1996), the court noted that remarks may serve as sufficient evidence of dis-

crimination if the offered comments are: 1) related to the protected class; 2) proximate in time to the employment decision; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue. Comments that are "vague and remote in time" are usually insufficient to support an inference of discrimination. *Haas v. ADVO Sys., Inc.*, 168 F.3d 732, 733 (5th Cir.1999).

Abraham has presented evidence that the disparaging comments about his religious belief were proximate in time to the termination; that the remarks were made by the people who decided as to whether his absences were excused or not and whether to fire him; and that the remarks were related to his employment. (Docket Entry No. 21).

Diagnostic Center argues that the comments were unrelated to the challenged employment decision. (Docket Entry No. 14). The summary judgment evidence does not support this argument. According to Diagnostic Center, Abraham was fired for unexcused absences. Abraham testified that the absences were directly related to the neck injury he suffered in a car accident. Kain and Heald allegedly made comments to Abraham about his religious beliefs in relation to the neck injury and to his absences from work. *Id.* at Ex. 3. In deciding a motion for summary judgment, this court must not disregard "critical evidence supporting [plaintiff's] *prima facie* case and undermining respondent's nondiscriminatory explanation." *Reeves,* 120 S.Ct. at 2111 (discussing court of appeals' erroneous treatment of evidence of several remarks probative of discriminatory animus).

Abraham has also produced competent summary judgment evidence that Diagnostic Center treated him differently from other, nonreligious employees. The ab-

sence logs show that two of Abraham's absences were originally marked as excused and later changed to unexcused. (Docket Entry No. 21, Ex. D). Abraham submitted summary judgment evidence indicating that no other employee had absences originally described as excused and then changed to unexcused. (Docket Entry No. 21, Ex. H; Fiddler Aff.). Abraham provided summary judgment evidence that Diagnostic Center did not hold another employee to the same call-in procedure it applied to Abraham. Diagnostic Center allegedly applied the policy to require Abraham to give advance notice of an unforeseen absence, but did not take this unrealistic approach with others.

In response, Diagnostic Center offers summary judgment evidence indicating that it discharged three other employees for excessive unexcused absences. (Docket Entry No. 23). As to the first employee, Kain could not remember any details concerning the reason that employee was fired. As to the second, Kain testified that the employee was in a car accident, after which he failed to provide "notice, the dates he would be out, [and] the dates he would return." *Id.* at Ex. A, p. 100. Kain testified that the third employee worked for three or four weeks, received his first full paycheck and never returned. *Id.* at pp. 100–01.

Diagnostic Center's evidence does not show that, as a matter of law, it held Abraham to the same standards as other employees. Abraham has submitted summary judgment evidence creating a genuine issue of fact as to whether his absences were treated differently than those of similarly situated employees, which can be evidence of discrimination. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282–84, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817.

On its face, the Attendance Policy gives both Kain and Heald discretion in categorizing absences. The parties do not dispute that Abraham's neck injury constituted a valid reason for missing work. Abraham was fired after four absences that Diagnostic Center characterized as unexcused under its call-in policy: April 13, 21, 29, and 30. (Docket Entry No. 14). Abraham has presented competent summary judgment evidence that he called in as soon as he knew he would be absent on the first two occasions. Abraham testified that he considered these absences to be emergency absences and that he properly followed the emergency phone-in procedure. Kain testified that an unexpected "illness" can qualify as an emergency and that the absence of an employee who becomes sick on the way to work, turns around, goes home and calls work upon arriving at home would be considered excused. (Docket Entry No. 21, Kain Dep.). As to the fact that on April 21, it was Abraham's wife who called in, Abraham testified that on at least two occasions, he received calls at work from Kain's wife, asking Abraham to notify Heald that Kain would not be at work that day because he was ill. (Docket Entry No. 21, Abraham Aff.).

Abraham gave advance, written notice of his absences in the form of a faxed doctor's work excuse on the second two occasions. The summary judgment record shows that Diagnostic Center had actual notice, more than four hours before his absence, that Abraham would be absent on April 29 and April 30. Karen Abraham testified that when she picked up Abraham's check, she was told by Laura Heald's secretary that they had received the doctor's April 28, 1998 fax, but that Abraham still needed to call Kain directly, which he did.

Kain testified that had the doctor's fax been directed to him instead of Laura Heald on April 28, the April 29 and April 30 absences would have been considered excused. (Docket Entry No. 21, Kain dep.). Although Diagnostic Center contends that Abraham gave notice to the incorrect person, the policy requires notice to be given to the "Department Director or designee." According to Kain, Heald was the department director. *Id.* The release was sent to Heald's fax number, at the direction of the head of human resources, and was timely received.

The summary judgment record presents genuine issues of disputed fact material to determining whether two supervisors, who allegedly made multiple comments showing religious animus to Abraham, were motivated by this discriminatory animus in deciding to discharge Abraham. Abraham has met his burden under *Reeves*, 120 S.Ct. at 2108–09. *See also Evans v. City of Bishop*, 238 F.3d 586, 590–92 (5th Cir. 2000). Diagnostic Center's motion for summary judgment as to Abraham's claim of religious discrimination is DENIED.

### B. Title VII Retaliation

In his response to Diagnostic Center's motion for summary judgment, Abraham responded that although he "did complain about religious discrimination and there is evidence of retaliation, [he] chooses not to pursue his retaliation claim any further." (Docket Entry No. 21). Diagnostic Center's motion for summary judgment as to Abraham's claim of retaliation in violation of Title VII is GRANTED.

### IV. Conclusion

Diagnostic Center's motion for summary judgment as to Abraham's claim of discrimination on the basis of religion is DENIED. Diagnostic Center's motion for summary judgment as to Abraham's claim of Title VII retaliation is GRANTED. The parties are hereby **ORDERED** to ap-

pear for a scheduling conference on **March 28, 2001 at 8:45 a.m.**